**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
WESTERN DIVISION**

Allen Varwig,                                             :          Case No. 1:10 CV 0450

    Plaintiff,                                        :

        vs.                                      :

Commissioner of Social Security,            :          **MEMORANDUM OPINION &
                                                                           ORDER**

    Defendant.                                       :

       Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying his claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act).  Pending are the parties' Briefs on the Merits (Docket Nos. 17 and 18).  For the reasons set forth below, the Magistrate affirms the Commissioner's decision.

.                                      **I. PROCEDURAL BACKGROUND**

       On August 8, 2006, Plaintiff filed an application for DIB, alleging that he had been disabled since July 3, 2003 (Docket No 3, Exhibit 6, pp. 2-4 of 11).  The application for DIB was denied initially and upon reconsideration.  A hearing was conducted on February 18, 2009, before Administrative Law Judge (ALJ) Mark Karisme. Plaintiff, represented by counsel, and Vocational Expert (VE) Gene Burkhammer appeared and testified (Docket No. 13, Exhibit 3, p. 2 of 26).  On April 29, 2009, the ALJ concluded that Plaintiff was not under a disability as defined under the Act (Docket No. 13, Exhibit 2,

pp. 10-22 of 22).  The ALJ's decision became the final decision of the agency when the Appeals Council denied review on January 11, 2010 (Docket No. 13, Exhibit 2, pp. 2-4 of 22).  An action in this Court seeking judicial review of the Commissioner's decision denying benefits was timely filed.

## II.  FACTUAL BACKGROUND

### A.  PLAINTIFF'S TESTIMONY

Plaintiff, forty years of age, was awarded a temporary total award under the worker compensation statutes.  He was married and had one child.  Although his wife had fibromyalgia, she was not on disability, (Docket No. 13, Exhibit 3, pp. 6 of 19, 20, 21 of 26).  Plaintiff completed high school and received a certificate from the Cuyahoga Community College for industrial maintenance and electricity (Docket No. 13, Exhibit 3, pp. 6-7 of 26).

Plaintiff had an extensive history of work in the automobile industry.  He worked as a"body man," preparing the surfaces of vehicles, prior to painting, using a frame machine.  He lifted a couple of hundred pounds with assistance.  At Branch Air, Plaintiff performed similar duties except that he did not use a frame machine.  In addition, he painted and refinished vehicle surfaces.  He lifted "maybe 100 pounds."  At Ganley Oldsmobile, Plaintiff was a working manager, doing repairs, refinishing the vehicles, writing estimates and repair orders (Docket No. 13, Exhibit 3, pp. 7-8 of 26).  At Sterling Collision, Plaintiff was the repair process manager or liaison between the customer and the repair process.  He worked eleven hours daily and he alternated equally between sitting and standing (Docket No. 13, Exhibit 3, p. 9 of 26).  While employed at Sterling Collision, Plaintiff began self medicating, taking twice the prescribed dosage of Percocet.  .  His condition did not improve.  Eventually, he quit working(Docket No. 13, Exhibit 3, p. 10 of 26).

Plaintiff was undergoing psychological treatment bi-weekly (Docket No. 13, Exhibit 3, p. 16 of

26) and he continued to take pain medication; however, it made him "zombie-like."  Plaintiff had

undergone injections in his back and had surgery in 2007 (Docket No. 13, Exhibit 3, p. 13 of 26).  His

pain subsided immediately.  Subsequently, he experienced numbness in his feet and pain in his legs

and his back deteriorated gradually (Docket No. 13, Exhibit 3, p. 14 of 26).

Plaintiff estimated that he could stand up to three hours and sit approximately two hours daily

in increments of 45 minutes (Docket No. 13, Exhibit 3, p. 15 of 26).  He could mow the lawn with a

riding mower but the symptoms were heightened for several days thereafter (Docket No. 13, Exhibit 3,

p. 20 of 26).  Plaintiff assisted his spouse with household chores (Docket No. 13, Exhibit 3, p. 21 of 26).

**B.**     **THE VE'S TESTIMONY**

   **1.**     **HYPOTHETICAL QUESTION NUMBER ONE:**

The VE considered a hypothetical worker of Plaintiff's age, educational background and level

of employment, who could:

- ▸  lift and carry up to ten pounds occasionally,
- ▸  lift and carry five pounds frequently,
- ▸  stand and walk for two hours out of an eight-hour workday,
- ▸  push and pull up to ten pounds occasionally,
- ▸  push or pull five pounds frequently,
- ▸  occasionally stoop and occasionally crouch,
- ▸  engage in simple routine work, with superficial interaction with co-workers and the public without negotiation and confrontation.

The hypothetical individual could not:

- ▸  climb ladders, ropes or scaffolds,
- ▸  perform high production quota work.

The VE responded that consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a

hypothetical worker with this profile could perform the following work subject to availability in the local

national and Ohio economies:

| Job | DOT Number | Local Availability | National Availability | Ohio Availability |
|---|---|---|---|---|
| Charge Account Clerk | 205.367-014 | 300 | 85,000 | 3,000 |
| Food & Order Beverage Clerk | 209.567-014 | 200 | 90,000 | 4,000 |
| Information Clerk | 237.367-046 | 500 | 90,000 | 4,000 |

All the above jobs had a specific vocational preparation of two which means that the hypothetical worker could perform the job after a short demonstration and up to one month of training (Docket No. 13, Exhibit 13, p. 24 of 26).

    **2.**    **HYPOTHETICAL QUESTION NUMBER TWO**:

The ALJ posed the same characteristics as stated in hypothetical one above except that the hypothetical worker would be off task 20% of the time because of pain and difficulties.  On any given day, this hypothetical worker could only sustain work at 80% level or conversely, one day a week the hypothetical worker could not perform all of his/her assigned duties.  The VE advised that there would be no competitive employment for hypothetical worker two (Docket No. 13, Exhibit 3, pp. 24-25 of 26).

**III. MEDICAL EVIDENCE.**

Plaintiff sustained an on-the-job injury on August 21, 2000, which manifested ed as back pain (Docket No. 13, Exhibit 10, p. 18 of 31).

On July 8, 2001, Plaintiff was diagnosed with sciatica.  The symptoms were treated with pain

4

and an anti-allergy medications (Docket No. 13, Exhibit 15, p. 18 of 37wi).  The x-ray showed some seasoned compression deformity to T11, T12 and L1 in the thoracic and lumbar spines.  No acute injury was identified (Docket No. 13, Exhibit 15, p. 21 of 37).

In November 2000, the results from an magnetic resonance imaging (MRI) scan showed 2mm disc protrusion at L5-S1, disc degeneration at L1-L2, L4-L5 and L5-S1 levels, most marked at L1-L2 and no evidence of root compression (Docket No. 13, Exhibit 10, p. 22 of 31; Exhibit 12, p. 3 of 14). The views of the lumbar spine taken on October 5, 2002, showed evidence of degenerative joint disease and possible fracture of the pars interarticularis, a part of the vertebra located between the inferior and superior articular processes of the facet joint.  Wikipedia.org/wiki/Pars_interarticularis.  Plaintiff tried physical therapy, a rehabilitation program and work hardening exercises without lasting benefits (Docket No. 13, Exhibit 10, p. 20 of 31; Exhibit 11, p. 6 of 11).

On January 27, 2003, an MRI of Plaintiff's lumbar spine was administered.  There was no evidence of fracture or soft tissue edema.  There was evidence of degenerative changes characterized by loss of height and signal, herniated nucleus pulposus of the left at L5-S1 (Docket No. 13, Exhibit 11, p. 9 of 11).

On June 27, 2003, Plaintiff underwent dual isotope myocardium perfusion imaging which showed normal results (Docket No. 13, Exhibit 10, p. 30 of 31).  On July 25, 2003, the x-ray of the lumbar spine showed herniation of the intervertebral disc at the L5-S1 level on the left side causing compression of the S1 nerve root (Docket No. 13, Exhibit 10, p. 27 of 31).  The exercise stress test administered on June 27, 2003,  showed normal results (Docket No. 13, Exhibit 10, p. 31 of 31).

5

On July 25, 2003, Plaintiff underwent a lumbar myelogram during which a special dye was used to X-ray the bones and spaces between the bones.  The examination showed increased space at the anterior aspect of the thecal sac at L5-S1 and mild compression of the S1 nerve roots.   The computed tomographic (CT)  scan of Plaintiff's lumbar spine showed herniation of intervertebral disc at L5-S1 level on the left side (Docket No. 13, Exhibit 15, p. 12 o 37).  Plaintiff had satisfactory relief of his symptoms following block facet injections administered on October 27, November 24 and December 26, 2003, by Dr. Ben Ortega, a neurosurgeon (Docket No. 13, Exhibit 10, p. 15 of 31; Exhibit 14, p. 25, 27 of 34).  Plaintiff cancelled surgery that was scheduled on July 13, 2004.  Dr. Ortega consulted with Plaintiff on July 26, 2004,  for purposes of discussing pain management.  The neurological examination revealed no definite muscle weakness (Docket No. 13, Exhibit 10, p. 6 of 31).

Plaintiff was treated for acute exacerbation of lumbar radicular disease on December 17, 2004, with a pain reliever and muscle relaxer (Docket No. 13, Exhibit 14, p. 23 of 24).

On January 7, 2005, Plaintiff presented to the Parma Community General Hospital with a corneal abrasion to the left eye (Docket No. 13, Exhibit 14, p. 17 of 34).  Plaintiff was treated for chronic back pain on February 19 and March 1, 2005.  He was prescribed a pain reliever and/or muscle relaxer and/or instructions to apply warm compresses (Docket No. 13, Exhibit 14, pgs. 11, 15 of 34).

The MRI of Plaintiff's lumbar spine taken on March 15, 2005 was compared to the test administered on January 27, 2003.  The results showed a loss of height and signal at L5-S level, focal disc herniation identified at L5-S1 toward the left, a lesion decreased slightly in size and bilateral neural foraminal narrowing at L5-S1, left slightly worse than the right (Docket No. 13, Exhibit 10, p. 10 of 31).

6

On March 18, 2005, axial CT images, without oral or intravenous contrast, were taken of Plaintiff's abdomen and pelvis.  A small amount of scarring was noted on the left lung; however, no kidney or urethral stones were detected, the prostate was normal and there was no evidence of appendicitis, cholectystitis or diverticulitis (Docket No. 13, Exhibit 13, p. 22 of 22).

Dr. Leonor M. Osorio, a Doctor of Osteopathic Medicine (DO), associated with Parma Community General Hospital, examined and/or treated Plaintiff as follows:

- March 29, 2005--low back pain, and allergic rhinitis.
- May 2, 2005--low back pain secondary to disc disease and allergic rhinitis.
- May 13, 2005--left otitis media with possible early maxillary sinusitis.
- June 2, 2005–low back pain chronic secondary to disc disease.
- June 29, 2005–low back pain, chronic secondary to disc disease.
- July 29, 2005–low back pain, chronic secondary to disc disease as well as obesity.
- August 29, 2005–chronic pain syndrome and daytime somnolence.
- September 29, 2005–chronic pain syndrome, weight gain and excessive sweating.
- January 11, 2006–low testosterone and weight loss.

(Docket No. 13, Exhibit 13, pgs. 7-15 of 22).

On February 28, 2007, Dr. Osorio determined that Plaintiff's electrocardiogram showed normal sinus rhythm and that risk factors were present for obstructive sleep apnea (Docket No. 13, Exhibit 20, p. 17 of 18).  On March 15, 2007, Dr. Osorio gave Plaintiff "postdated a prescription for pain medication" (Docket No. 13, Exhibit 20, p. 16 of 18).  Plaintiff reported to Dr. Osorio on July 13, 2007, that he was recovering well after surgery (Docket No. 13, Exhibit 21, p. 24 of 26).  On September 13, 2007, Dr. Osorio supplemented Plaintiff's medications with a muscle relaxant (Docket No. 13, Exhibit 21, p. 21 of 26).

Dr. Todd S. Hochmann, M. D., an internist, treated the symptoms of Plaintiff's back pain with

radicular symptoms beginning on September 14, 2005,  with a Duragesic patch  as well as Percocet for

breakthrough pain (Docket No. 13, Exhibit 14, p. 31 of 37) .  The pain progressed and on December 28,

2005,  Dr. Hochmann  supplemented  the opioid treatment  with OxyContin.   At each meeting, Dr.

Hochmann conducted a pain management consultation (Docket No. 13, Exhibit 15, pgs. 23 -33 of 37).

In January 2006, Dr. Hochmann resolved potential problems with some early refills (Docket No. 13,

Exhibit 15, pp. 34-35 of 37).  Plaintiff continued to return monthly through October 20, 2006,  to obtain

medication (Docket No. 13, Exhibit 16  pgs. 3-8 of 45; Exhibit 17, pp. 15-20 of 39).  On October 4,

2006, Dr. Hochmann advised Plaintiff of a plan to wean him from Percocet (Docket No. 13, Exhibit 17,

p. 19 of 39).

Dr. Charles V. Barrett, a DO associated with the Centers for Comprehensive Pain Care,

evaluated Plaintiff on October 24, 2005.  A prescription in an escalating dosage was prescribed to treat

pain (Docket No. 13, Exhibit 17, p. 33 of 39).  On June 5, 2006, Dr. Barrett diagnosed Plaintiff with

displaced lumbar disc and recommended that Plaintiff undergo opioid titration (Docket No. 13, Exhibit

17, p. 28 of 39; Exhibit 20, p. 14 of 18).  Dr. Barrett examined Plaintiff's urine and determined that he

was clear of any narcotics; however, the recurring issues of missing Oxycontin was addressed at length

on January 16, 2007 (Docket No. 13, Exhibit 20, p. 5 or 18). Dr. Barrett increased the medication

prescribed to prevent migraines and/or treat seizures on March 13, 2007 (Docket No. 13, Exhibit 20, p.

3 of 18).  Plaintiff presented to Dr. Barrett post laminectomy on September 18, 2007.  Dr. Barrett noted

that the left leg pain had dissipated but Plaintiff had some burning pain.  Plaintiff exhibited pain in the

lumbar flexion and extension but only at extremes.  There was no evidence of focal deficits in the lower

8

extremities (Docket No. 13, Exhibit 23, p. 12 of 28).  Dr. Barrett added Celebrex to Plaintiff's medications on  March 25, 2008 (Docket No. 13, Exhibit 22, p. 13, of 24).  On May 20, 2008, Plaintiff told Dr. Barrett that the combination of Percocet, Topamax and Xanax had fairly good efficacy and permitted Plaintiff to function at school (Docket No. 13, Exhibit 23, p. 7 of 28).  By August 26, 2008, Plaintiff admitted to Dr. Barrett that the Percocet was no longer beneficial (Docket No. 13, Exhibit 23, p. 6 of 28).

Commencing on January 12, 2006, Dr. Samuel A. Nigro, M.D., a psychiatrist, addressed several target signs and symptoms of Plaintiff's mental status.  Dr. Nigro employed psychotherapeutic techniques including drug therapy to resolve Plaintiff's subjective analysis of his depressive condition (Docket No. 13, Exhibit 19, pp. 3, 12, 14-17, 19 of 19).  On August 22, 2006, Dr. Nigro reaffirmed that Plaintiff had a major depressive disorder (Docket No. 13, Exhibit 16, p. 24,  25 of 45).

On January 14, 2006, Plaintiff underwent a psychological evaluation during which the Million Clinical Multiaxial Inventory-III, a measure of personality, was administered**.**  The first axis showed evidence of strong self deprecating judgment and feelings of inadequacy which contributed to Plaintiff's recent major depression.  The results from the second axis suggested that Plaintiff was characterized by a pervasive apprehensiveness, intense and variable moods, prolonged periods of dejection and self-deprecation and episodes of withdrawn isolation and unpredictable anger. Considering these results and guidelines of the American Medical Association's EVALUATION OF PERMANENT IMPAIRMENT, Dr. James M. Medling, Ph.D., a clinical psychologist, opined that Plaintiff suffered from major depression and that major depression rendered him permanently and totally disabled (Docket No. 13, Exhibit 12, pp. 9-14

9

of 14).

Dr. Medling commenced individual psychotherapy on January 12, 2006 .  He discussed several personal issues including a deteriorating marriage, poor health and bankruptcy (Docket No. 13, Exhibit 21, pp. 11-19 of 26; Exhibit 22, p. 18-24 of 24).  By August 24, 2006, Plaintiff had completed his authorized series of visits and improved his coping strategies and communication skills although his symptoms remained severe (Docket No. 13, Exhibit 21, p. 10 of 26).  Dr. Medling conducted another examination on January 14, 2007.  He again concluded that Plaintiff's psychological status rendered him completely and totally disabled from all forms of gainful employment  (Docket No. 13, Exhibit 18, pp. 6-11 of 11).

Plaintiff complained of right wrist pain on February 4, 2006.  The X-rays of Plaintiff's wrists showed no fracture, dislocation or bony abnormality (Docket No. 13, Exhibit 13, p. 21 of 22).  However, Plaintiff was diagnosed with tendinitis and treated with a canvas wrist splint and a prescription for an anti-inflammatory drug (Docket No. 13, Exhibit 14, p. 6 of 34).

Dr. Douglas Pawlarczyk, Ph. D., a psychiatrist, opined on September 22, 2006, that Plaintiff had an affective disorder characterized by loss of interest in all activities, appetite disturbance with change in weight, sleep disturbance and feelings of guilt or worthlessness (Docket No. 13, Exhibit 16, p. 35 of 45).  Pertinent symptoms, signs and laboratory findings substantiated the presence of an adjustment disorder with anxiety and a personality disorder, not otherwise specified (Docket No. 13, Exhibit 16, pp. 37, 39 of 45).  There was a mild degree of limitation in the restriction of activities of daily living and difficulties in maintaining social functioning and a moderate degree of limitation in difficulties in

10

maintaining concentration, persistence or pace.  There were no episodes of decompensation for an extended duration (Docket No. 13, Exhibit 16, p. 42 of 45).

Dr. Pawlarczyk also opined that Plaintiff had moderate limitations in his ability to:

- ▸ perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.
- ▸ complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
- ▸ respond appropriately to changes in the work setting.

(Docket No. 13, Exhibit 17, p. 2-3 of 39).

On September 22, 2006, Dr. Paul Heban, M. D., an internist, established that there were no manipulative, visual, communicative or environmental limitations (Docket 13, Exhibit 17, pp. 9-11 of 39).  Plaintiff did, however, have the following exertional limitations:

- ▸ occasionally lift and/carry twenty pounds or climb using a ladder/rope/scaffolds.
- ▸ frequently lift and/carry ten pounds, stoop or crouch.
- ▸ stand and/or walk about six hours in an eight-hour workday.
- ▸ sit about six hours in an eight-hour workday.
- ▸ push and/or pull on an unlimited basis.

(Docket No. 13, Exhibit 17, pp. 7-8 of 39).

Plaintiff underwent another series of individual psychotherapy with Dr. Medling beginning on May 21, 2008.  Despite escalating marital problems and the presence of a myriad of financial and familial woes, Plaintiff managed to attend school and search for employment.  Plaintiff continued to undergo counseling with Dr. Medling through February 4, 2009 (Docket No. 13, Exhibit 23, pp. 25-28 of 28).

11

Dr. Jack Anstandig, M. D., a neurologist, generated an electromyography report on December 30, 2008, of both lower extremities.  He found electrical evidence of left L5 radiculopathy, mild in degree with signs of active interruption of the nerve connections.  The nerve conduction study of Plaintiff's  right lower extremity was normal and there were no electrical abnormalities suggestive of a superimposed sensorimotor peripheral polyneuropathy (Docket No. 13. Exhibit 23, p. 4 of 28).

### IV.  STANDARD FOR ESTABLISHING DISABILITY

To be entitled to disability insurance benefits, an individual must be under a disability within the meaning of the Act.  *Rabbers v. Commissioner Social Security Administration*, 582 F.3d 647, 651 -652 (6th Cir. 2009) (*citing* 42 U.S.C. § 423(a)(1)(E)).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U. S. C. § 423(d)(1)(A)).  The individual also must be insured for disability insurance benefits, have not attained retirement age, and have filed an application for benefits.  *Id.* at 652 fn. 5 (*citing* 42 U.S.C. § 423(a)(1)).

The Social Security Administration (SSA) has established a five-step sequential evaluation process for determining whether an individual is disabled.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)).  If the claimant is found to be conclusively disabled or not disabled at any step, the inquiry ends at that step. *Id.*  The five steps are as follows:

(1)     If the claimant is doing substantial gainful activity, the claimant is not disabled.

(2)     If the claimant does not have a severe medically determinable physical or mental

12

impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.

(3)     If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

(4)     If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

(5)     If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Id.* (*citing* 20 C. F. R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g); *see also Cruse v. Commissioner of Social Security,* 502 F.3d 532, 539 (6th Cir. 2007); *Walters v. Commissioner of Social Security,* 127 F.3d 525, 529 (6th Cir. 1997)).  The claimant bears the burden of proof through step four; at step five, the burden shifts to the Commissioner.  *Id.* (*citing Jones v. Commissioner of Social Security,* 336 F.3d 469, 474 (6th Cir. 2003)).

## V.  THE ALJ'S FINDINGS

The ALJ applied the governing five step analysis and determined that Plaintiff was not disabled. At step one, the ALJ found that Plaintiff met the insured status requirements of the Act on July 3, 2003, his alleged onset date, and he continued to meet the requirements through December 31, 2008,  but not thereafter.  Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of July 3, 2003, through his date last insured of December 31, 2008 (20 C.F.R. § 404.1571 *et seq.*).

At step two, the ALJ found that through the date last insured, Plaintiff had the following severe

13

impairments: herniated L5-S1 disc, surgically treated in June 2007 with left L5 radiculopathy, diffuse degenerative disc disease of the lumbar spine, major depression, generalized anxiety disorder and a pain disorder associated with both psychological factors and a general medical condition.

At step three, the ALJ found that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1525 and 404.1526).  At that point, the ALJ determined that Plaintiff had the residual functional capacity to perform the exertional requirements of sedentary work subject to nonexertional limitations, more specifically, he can lift, carry, push and/or pull ten pounds occasionally and five pounds frequently, he can sit for up to six hours, stand and /or walk two hours during the course of an eight-hour workday.  From the non-exertional standpoint, Plaintiff cannot climb ladders, ropes or scaffolds, but he can occasionally stoop or crouch.  Plaintiff can perform simple routine work but not high production quota work and he can engage in superficial interactions with co-workers and the public provided there is no negotiation or confrontation.

At step four, the ALJ found that Plaintiff was incapable of performing his past relevant work through the date last insured.  However, at step five, the ALJ found that Plaintiff, a younger individual with a high school education and the ability to communicate in English, was capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  Based upon his step five  finding, the ALJ concluded that Plaintiff was not under a disability, as defined in the Act, at any time from July 3, 2003, the alleged onset date, through December 31, 2008, the date last insured.

14

(Docket No. 13, Exhibit 2, pp. 10-22 of 22)

## VI. STANDARD OF REVIEW

When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Johnson v. Astrue,* 2010 WL 5559542, *3 (N. D. Ohio 2010) (*citing Blakley v. Commissioner of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  The reviewing court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility.  *Id.* (*citing Walters*, *supra*, 127 F.3d at 528).

If the ALJ applied the correct legal standards and his or her findings are supported by substantial evidence in the record, his or her decision is conclusive and must be affirmed.  *Id.* (*citing Warner v. Commissioner of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004); 42 U.S.C. § 405(g)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id*. (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971) (*citing Consolidated Edison v. NLRB*, 59 S. Ct. 206, 217 (1938)).  The substantial evidence standard is intended to create a "zone of choice within which the Commissioner can act, without the fear of court interference."  *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, it is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently.  *Id*. (*citing Crisp v. Secretary of Health & Human Services,* 790 F.2d 450, 453 n. 4 (6th Cir. 1986)).

15

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner. *Id.* (*see Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) ("Although substantial evidence otherwise supports the decision of the Commissioner in this case, reversal is required because the agency failed to follow its own procedural regulation, and the regulation was intended to protect applicants like [plaintiff]."); *Id*. at 546 ("The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action ... found to be ... without observance of procedure required by law.' ") (*quoting* 5 U.S.C. § 706(2)(d) (2001)); *cf. Rogers*, 486 F.3d at 243 (holding that an ALJ's failure to follow a regulatory procedural requirement actually "denotes a lack of substantial evidence, even when the conclusion of the ALJ may be justified based upon the record").  "It is an elemental principal of administrative law that agencies are bound to follow their own regulations," *Id.* (*citing Wilson*, *supra*, 378 F.3d at 545, and the Court therefore "cannot excuse the denial of a mandatory procedural protection ... simply because there is sufficient evidence in the record" to support the Commissioner's ultimate disability determination. *Id.* (*citing Wilson*, *supra*, 378 F. 3d at 546).  The Court may, however, decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors were harmless. *Id*. (*see Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009) (finding that a party seeking to overturn an agency's administrative decision normally bears the burden of showing that an error was harmful)).

An ALJ's violation of the SSA's procedural rules is harmless and "will not result in reversible error absent a showing that the claimant has been prejudiced on the merits or deprived of substantial

rights because of the [ALJ]'s procedural lapses." *Id.* at \*4 (*citing Wilson*, *supra*, 378 F.3d at 546-47 (emphasis added) (*quoting Connor v. United States Civil Services Commissioner*, 721 F.2d 1054, 1056 (6th Cir. 1983)). Thus, an ALJ's procedural error is harmless if his or her ultimate decision is supported by substantial evidence and the error did not deprive the claimant of an important benefit or safeguard. *Id.* (*see Wilson, supra*, 378 F. 3d at 547 (holding that an ALJ's violation of the rules for evaluating the opinion of a treating medical source outlined in 20 C.F.R. § 404.1527(d) was a deprivation of an "important procedural safeguard" and therefore not a harmless error). If a procedural error is not harmless, then it warrants reversing and remanding the Commissioner's disability determination. *Id.* (*citing Blakley*, *supra*, 581 F.3d at 409) (stating that a procedural error, notwithstanding the existence of substantial evidence to support the ALJ's ultimate decision, requires that a reviewing court "reverse and remand unless the error is a harmless de minimis procedural violation").

### VII. PLAINTIFF'S POSITION.

Plaintiff asserts that ALJ failed to apply the correct legal standard when according weight to the treating physician's opinions and assessing his credibility. There are two components to Plaintiff's treating physician claim.

First, Plaintiff claims that Dr. Ortega's opinions are based on diagnostic medical findings. Thus, the ALJ erred in failing to give controlling weight to the opinion of Dr. Ortega that he was physically incapacitated and therefore incapable of engaging in functional employment beyond sedentary level due to inability to lift more than 20 pounds, sit more than 15 minutes at a time and work beyond a very soft smooth surface.

Next, Plaintiff claims that the ALJ failed to explain why he attributed little probative weight to Dr. Ortega's opinions.

17

Plaintiff argues that at a minimum, this case should be reversed and remanded to the Commissioner to reconsider the weight that should be attributed to Dr. Ortega's opinion and to analyze Plaintiff's claims of pain consistent with the correct legal standards.

## VIII.  DEFENDANT'S POSITION

Defendant argues that substantial evidence supports the ALJ's findings on residual functional capacity and credibility and the weight attributed to the medical source opinions.  Moreover, substantial evidence supports the ALJ's finding that a significant number of jobs accommodated Plaintiff's functional capacity and vocational profile.

## IX.  ANALYSIS OF TREATING PHYSICIAN ISSUES

In social security cases involving a claimant's disability, the Commissioner's regulations require that if the opinion of the claimant's treating physician is ' "well-supported by medically acceptable clinical and laboratory diagnostic techniques' and [is] 'not inconsistent with the other substantial evidence in [the] case record,' " it must be given "controlling weight." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (*citing Wilson v. Commissioner of Social Security*, 378 F. 3d 541, 544 (6th Cir. 2004) (*citing* 20 C.F.R. § 404.1527(d)(2)).  "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion." *Id.* (*citing Wilson*, *supra*, 378 F.3d at 544 (quoted with approval in *Bowen v. Commissioner of Social Security,* 478 F.3d 742, 747 (6th Cir. 2007)).  Even if the treating physician's opinion is not given controlling weight, "there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference." *Id.* (*citing*

*Rogers*, *supra*, 486 F.3d at 242).

## A. CONTROLLING WEIGHT

Plaintiff argues that the ALJ erred in failing to attribute contributing weight to Dr. Ortega's opinion of September 1, 2006, that he was physically incapacitated due to his inability to resume functional employment beyond the sedentary level due to an inability to lift more than twenty pounds, sit more than fifteen minutes at a time and work beyond a very soft smooth surface. For two reasons, this assertion lacks merit.

First, at the time Dr. Otega made the observation on September 1, 2006, he had not seen Plaintiff since July 26, 2004. Dr. Ortega made no medical diagnosis and gave no medical opinion regarding Plaintiff's physical incapacity. Observations without medical basis are not the type of information from a treating physician which will be provided great weight under 20 C.F.R. § 404.1513(b). *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007).

Second, the ALJ was not bound by Dr. Ortega's statement that Plaintiff was physically incapacitated in determining disability. No special significance will be given to opinions of disability even if coming from a treating physician. *Id.* (*citing* 20 C. F. R. § 404.1527(e)(3) (2006); SSR96-5: POLICY INTERPRETATION RULING TITLES II AND XVI: MEDICAL SOURCE OPINIONS ON ISSUES RESERVED TO THE COMMISSIONER, 61 Fed. Reg. 34471, 34473 (Soc. Sec. Admin. July 2, 1996)). The issue of disability is reserved to the Commissioner. *Id.*

The ALJ was not obligated to attribute controlling weight to Dr. Ortega's conclusion that Plaintiff was physically incapacitated and therefore incapable of engaging in functional employment beyond the sedentary level due to exertional and environmental limitations.

## B. DISCOUNTING DR. OTEGA'S OPINION.

Plaintiff argues that ALJ failed to explain why he attributed little probative weight to Dr. Ortega's opinions.  Where an opinion of a treating physician is not accorded controlling weight, the ALJ **must** apply certain factors.  *Bowen, supra*, 478 F. 3d at 747.  Specifically, 20 C. F. R. § 404.1527(d) of the SSA's regulations prescribes that the ALJ is to consider:

 (1) the length of the treatment relationship and the frequency of examination,

 (2) the nature and extent of the treatment relationship,

 (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, and

 (5) the specialization of the treating source.  *Id.* (*citing* C.F.R. § 404.1527(d)).

The regulation further assures claimants that "[w] e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).

In the instant case, the ALJ did not totally disregard Dr. Ortega's opinions.  Instead, he considered these opinions and explained why little weight was attributed to them.  He addressed the factors in 20 C. F. R. § 404.1527(d) throughout the decision.  The ALJ failed to mention Dr. Ortega's specialty; however, he considered that Dr. Ortega's opinions did not provide a longitudinal review of Plaintiff's medical history.  The medical records support his conclusion.  The abridged version of Dr. Ortega's letters and notes show that he conducted a neurological consultation on November 18, 2002, after which he prescribed therapeutic changes (Docket No. 13, Exhibit 11, pp. 10- 11 of 11).  On February 8, 2003, Dr. Ortega prescribed drug therapy (Docket No. 13, Exhibit 11, p. 6 of 11).  On October 27, November 24 and December 26, 2003 Dr. Ortega administered a series of paraspinal blocks (Docket No. 13, Exhibit 10, p. 14 of 31).  Dr. Ortega rendered a narrative of Plaintiff's subjective complaints in April 2003 and September 2006 (Docket No. 13, Exhibit 11, p. 4 of 11; Exhibit 16, pp.

27-28 of 45).  Dr. Ortega administered a myelogram and CT scan in July 2003 (Docket No. 13, Exhibit 10, p. 26 of 31).  In August and September 2003,  Dr. Ortega conducted a clinical examination which involved bending Plaintiff's spine toward his waist.  He compared the progression of the disease with an MRI administered in January 2003 and continued pain control (Docket No. 13, Exhibit 10, pp. 23 , 24 of 31).

Clearly, Plaintiff saw Dr. Ortega irregularly during a period of two years.  Although Dr. Ortega conducted diagnostic tests, he failed to conduct independent review of Plaintiff's symptoms, instead relying in large part on Plaintiff's own description of his symptoms and functional limitations.  Upon review of the medical records, there is support for the ALJ's conclusion that Dr. Ortega's opinions and narratives were comprised largely of recitations of Plaintiff's own description of his symptoms and functional limitations.

While succinct, four of the five bases for discounting a treating physician's opinions are set forth in the decision.  Plaintiff has not demonstrated that he was prejudiced on the merits or deprived of substantial rights because the ALJ failed to include in the opinion or consider that Dr. Ortega was a neurosurgeon. This failure to identify Dr. Ortega's area of specialty constitutes harmless error.

The ALJ appropriately found that Dr. Ortega's opinion was not entitled to complete deference. He explained why Dr. Ortega's opinion garnered less weight than the weight typically attributed to a treating physician's opinions.  The ALJ applied the correct legal standard and his decision is supported by substantial evidence in the record.  Accordingly, the Magistrate finds that the Commissioner's decision with respect to treatment of Dr. Ortega's opinions should be affirmed.

### X. ANALYSIS OF PLAINTIFF'S CREDIBILITY.

It is Plaintiff's contention that his pain is established by objective medical evidence and that the

ALJ erred in his assessment of Plaintiff's pain and he failed to identify why he did not find Plaintiff's subjective complaints of pain credible.

## A. PAIN AS A DISABILITY.

Pain alone may be sufficient to support a claim of disability. *Woodland v. Astrue,* 2010 WL 3087461, 2 (N. D. Ohio 2010) (*see Grecol v. Halter*, 46 Fed. Appx. 773, No. 01-3407 (6th Cir. 2002) (unpublished); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir.1984)). Subjective assertions of pain, standing alone, however, will not suffice to support a claim of disability. *Id.* In most disability benefits cases, for the ALJ to find disabling pain, there must be objective evidence of an underlying medical condition; and either objective medical evidence confirming the severity of the alleged pain arising from that medical condition, or the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain. *Id.* (*see Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 852-853 (6th Cir. 1986)). In addition, the Commissioner must consider other factors that may or may not corroborate Plaintiff's allegations of pain. *Id.* (*see Walters, supra*, 127 F.3d at 53; *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994); 20 C.F.R. §§ 416.929(c)(2) and 404.1529(c)(2)). The other factors may include: statements from the claimant and the claimant's treating and examining physicians; diagnosis; efforts to work; the claimant's daily activities; the location, duration, frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate symptoms; treatment, other than medication, the claimant receives to relieve pain; measures used by the claimant to relieve symptoms; and any other factors concerning functional limitations due to symptoms. *Id.* (*see Felisky*, 35 F.3d at 1039-40; 20 C.F.R. §§ 416.929(a), (c) (3) and 404.1529(a), (c)(3)).

In this case, the ALJ reports that he considered the factors in 20 C. F. R. § 404.1529 (Docket No. 13, Exhibit 2, p. 17 of 22).  He relied on objective medical evidence which demonstrated that impairments of degenerative disc disease, a herniated disc and radiculopathy can reasonably be expected to give rise to the alleged pain.  Ultimately, he determined that Plaintiff had a severe pain disorder associated with both the underlying psychological factors and his general medical impairments.

## B. Credibility Determination based on pain.

Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 247 (6th Cir. 2007).  The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record.  *Id.*  Consistency between a claimant's symptom complaints and the other evidence in the record tend to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.  *Id.* at 248.

Social Security regulations state that "[o]pinions on some issues ... are not medical opinions ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(e) (providing a non-exhaustive list of examples of issues reserved to the Commissioner).  Precedent in this circuit and agency rulings support the premise that a credibility determination with respect to subjective complaints of pain rests solely with the ALJ.  *Allen v. Commissioner of Social Security*, 561 F.3d 646, 652 (6th Cir. 2009) (*citing Sisterlet v. Secretary of*

23

*Health & Human Services*, 823 F.2d 918, 920 (6th Cir. 1987); *see also Walters, supra*, 127 F.3d at 531) ("[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."); Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4 (1996)).

Apparently the ALJ considered the subjective complaints of pain and the objective medical evidence that made the subjective complaints credible.

## C. The Result.

The ALJ applied the correct legal standard and his decision is supported by substantial evidence in the record.  Accordingly, the Magistrate finds that  the Commissioner's decision with respect to the ALJ's treatment of Plaintiff's pain and his credibility should be affirmed.

## XI. Conclusion.

For the foregoing  reasons, the Court  affirms the Commissioner's decision that Plaintiff is not under a disability..


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   May 27, 2011